UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                 :

THE CITY OF NEW YORK,                    :

                           Plaintiff,        :          12 Civ. 4838 (JMF)

                                 :

              -v-               :        OPINION AND ORDER

                               :

ROBERT GORDON  ET AL.,            :

                               :

                       Defendants.     :

                               :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff, the City of New York ("the City"), brought this action seeking injunctive relief, penalties, and damages for violations of the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. § 375 *et seq.*; the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq.*; the Cigarette Marketing Standards Act ("CMSA"), N.Y. Tax L. § 483 *et seq.*; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  The City has moved for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, enjoining Defendants Robert and Marcia Gordon (together "the Gordon Defendants") from violating the PACT Act and the CMSA; and Defendants Marcia Gordon and Regional Integrated Logistics, Inc. d/b/a Regional Parcel Services ("RPS") from violating the CCTA. Defendants have moved to dismiss the case for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, the City's motion for a preliminary injunction is GRANTED, and the Defendants' motions to dismiss are DENIED.

## BACKGROUND

Both New York State and New York City impose taxes on cigarettes sold to their residents. *See* N.Y. Tax L. § 471(1); Admin. Code of City of New York ("Admin. Code") §§ 11-1302(a)(1), (2). Under New York law, these taxes must be prepaid through the purchase of tax stamps. *See* N.Y. Tax L. §§ 471, 473; Admin. Code §§ 11-1302, 11-1304. State and City laws require that the stamps be affixed to packages of cigarettes as evidence of payment. *See* N.Y. Tax L. §§ 471, 473; Admin. Code §§ 11-1302, 11-1304. The cost of this stamp then must be incorporated into the price of the cigarettes paid by the ultimate customer. *See* N.Y. Tax L. §§ 471, 473; Admin. Code §§ 11-1302(a)(3), (e), (h). The City alleges that Defendants operate a "'mail-order' scheme to traffic unstamped cigarettes into New York City." (Mem. Supp. City's Mot. Prelim. Inj. ("City Mem.") 2).

Defendant Robert Gordon, a member of the Seneca Nation of Indians, does business as and owns "All Of Our Butts," a company that sells tobacco products over the phone and internet, as well as in person on the Allegany Reservation of the Seneca Nation of Indians. (Am. Compl. ¶ 8; Proshansky Decl. Ex. A at 3, 5; Proshansky Decl. Ex. B, at 17; Proshansky Decl. Ex. D). Robert Gordon's wife, Defendant Marcia Gordon, who is not a member of the Seneca Nation, manages the daily operations of All Of Our Butts. (Am. Compl. ¶ 9; Proshansky Decl. Ex. B, at 46). The City alleges that since 2002, the Gordon Defendants, through All Of Our Butts, have sold thousands of cartons of unstamped — and thus untaxed — cigarettes to customers throughout the country, and in particular to New York City residents.[1] (Am. Compl. ¶ 61). The

---

[1]     On March 21, 2013, the law firm representing the Gordon Defendants moved to withdraw as counsel. (Docket No. 60). In the declaration accompanying the motion, the Gordons' then-attorney stated that All Of Our Butts has gone out of business. (Rader Decl. (Docket No. 63) ¶ 2). The Court has not received an affidavit from the Gordon Defendants or any other evidence regarding the business's closure.

City alleges that, beginning approximately June 29, 2010, Defendant RPS was the sole delivery service by which All Of Our Butts distributed cigarettes to City residents.  (*Id.* ¶¶ 40, 65, 66, 69).

In April of 2012, a City investigator ordered cigarettes from the All Of Our Butts website.  (*Id.* ¶ 43).  The cost of the cigarettes — two 200-count bags of "Rollies Menthol King" sold at fifteen dollars per bag (*id.* ¶ 43) — could not have included State and City taxes, which total over fifty dollars per bag.  *See* N.Y. Tax L. § 471(1); Admin. Code §§ 11-1302(a)(1), (2).  Approximately two weeks later, the cigarettes were delivered in a box labeled "RPS Regional Parcel Services."  (Am. Compl. ¶ 45).  An office clerk, not the investigator who had placed the order, received and signed for the delivery.  (*Id.* ¶ 46).  The delivery driver did not request that the clerk provide identification or any other form of age verification.  (*Id.*).  The cigarettes were unstamped.  (*Id.* ¶ 49).

In June of 2012, a City investigator again ordered cigarettes from the All Of Our Butts website.  (*Id.* ¶ 52).  Again, the cost of the cigarettes — two cartons of Seneca Menthol Kings, priced at $29.20 per carton (*id.*) — could not have included State and City taxes, which total over fifty dollars per carton.  *See* N.Y. Tax L. § 471(1); Admin. Code §§ 11-1302(a)(1), (2).  The order form stated that RPS would be responsible for shipping the order.  (Am. Compl. ¶ 53).  Approximately two weeks later, a delivery person for "LaserShip" delivery service delivered the cigarettes.  (*Id.* ¶ 55).  An office clerk, not the investigator who had placed the order, received and signed for the delivery.  (*Id.*).  The delivery driver did not request that the clerk provide identification or any other form of age verification.  (*Id.*).  The cigarettes were unstamped.  (*Id.* ¶ 59).  All Of Our Butts did not report either of the City investigator's purchases to the chief law enforcement officer of the City of New York.  (*Id.* ¶ 60).

On September 28, 2012, the City filed the amended complaint that is the basis for this action.  The City alleges that the Gordon Defendants, by failing to report All Of Our Butts' cigarette sales and by failing to use a delivery service that ensures that cigarettes are delivered only to those who meet the minimum age for the purchase of tobacco, have violated the PACT Act; and that by selling unstamped cigarettes to New York City residents, they have violated the CMSA.  The City further alleges that by selling and distributing more than 10,000 unstamped cigarettes to City residents, Marcia Gordon and RPS have violated the CCTA.  Finally, by depriving the City of tax revenue through conduct indictable under the CCTA, the City alleges that all Defendants have violated and conspired to violate RICO.  The City seeks a preliminary injunction enjoining Defendants from all claimed statutory violations, except those under RICO. Defendants, in turn, move to dismiss the City's claims.

## DISCUSSION

### I.    The City's Motion for a Preliminary Injunction

Generally, "a party requesting a preliminary injunction must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party."  *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010) (internal quotation marks omitted).  Here, however, because the City seeks a statutory injunction, irreparable harm is presumed.  As the Second Circuit recently explained, both the CMSA and the CCTA "make unlawful specific conduct related to the sale and possession of certain unstamped cigarettes, indicating Congress and the New York Legislature's determination that such conduct, in and of itself, is harmful to the public."  *Id.* at 121.  It is therefore unnecessary for "a party seeking a statutorily-sanctioned

4

injunction to make an additional showing of irreparable harm." *Id.*  The City is "entitled to a presumption of irreparable harm with the caveat that it must show a likelihood of success on the merits of its CMSA and CCTA claims." *Id.*  Although the Second Circuit did not specifically address the PACT Act, its enforcement provisions are, in relevant part, identical to those of the CCTA.  *Compare* 18 U.S.C. § 2346(b)(1) *with* 15 U.S.C. §378(c)(1)(A).  Therefore, the Court of Appeals' holding applies with equal force to the PACT Act as well.

Because the Court presumes irreparable harm under the CMSA, CCTA, and the PACT Act, the City is entitled to a preliminary injunction if it can demonstrate that it is likely to succeed on its claims that Defendants violated these statutes.  The City has satisfied this burden.

## A.  The PACT Act

First, the City alleges that the Gordon Defendants failed to comply with the reporting requirements of the PACT Act, *see* 15 U.S.C. § 376(a), as well as the Act's age verification requirements, *see id.* § 376a(b)(4).  (Am. Compl. ¶ 4).  In relevant part, the PACT Act requires "[a]ny person who sells, transfers, or ships for profit cigarettes . . . in interstate commerce" into a state or city that taxes "the sale or use of cigarettes" to file "a memorandum or a copy of the invoice covering each and every shipment of cigarettes" with the "chief law enforcement officers of the local governments . . . that apply their own local . . . taxes on cigarettes."  15 U.S.C. § 376(a).  All Of Our Butts shipped cigarettes from an Indian reservation to New York City residents, thus selling cigarettes in interstate commerce to a locality that taxes cigarette sales. The Gordon Defendants do not dispute that under the PACT Act, they are required to report these sales to the chief law enforcement officer of New York City.  The record contains undisputed evidence that they did not do so.  All Of Our Butts sold two shipments of cigarettes to a City investigator, neither of which was reported to the City.  (*See* Proshansky Decl. ¶¶ 27-

28; Monell Decl. ¶¶ 12, 23).  Furthermore, the Gordon Defendants admitted that in 2012, All Of

Our Butts did not file "any memoranda or copies of invoices covering . . . [the] shipment[s] of

cigarettes All Of Our Butts made into New York City."  (Bloom Decl. Ex. A, at 7).

　　　　The record also contains undisputed evidence that, in addition to violating the PACT

Act's reporting requirements, the Gordon Defendants violated the Act's age verification

requirements.  Section 376a(b)(4) of the Act provides:

> A delivery seller who mails or ships tobacco products —
>
> . . . .
>
> (ii) shall use a method of mailing or shipping that requires —
>
> > (I)　　the purchaser placing the delivery sale order, or an adult who is at
> > least the minimum age required for the legal sale or purchase of
> > tobacco products, as determined by the applicable law at the place
> > of delivery, to sign to accept delivery of the shipping container at
> > the delivery address; and
> >
> > (II)　　the person who signs to accept delivery of the shipping container
> > to provide proof, in the form of a valid, government-issued
> > identification bearing a photograph of the individual, that the
> > person is at least the minimum age required for the legal sale or
> > purchase of tobacco products, as determined by the applicable law
> > at the place of delivery

15 U.S.C. § 376a(b)(4).  Here, the City investigator purchased cigarettes from All Of Our Butts

online.  In both transactions, the cigarettes were delivered to a different person than the one who

placed the order, and the person who received the package was not required to provide proof of

age.  (Monell Decl. ¶¶ 8, 19).  That plainly runs afoul of the PACT Act.

　　　　The evidence in the record thus demonstrates that the City is likely to succeed on its

claims that the Gordon Defendants violated the PACT Act's reporting and age verification

requirements.  It is therefore entitled to a preliminary injunction prohibiting them from

continuing to do so.

**B. The CMSA**

Next, the City contends that the Gordon Defendants have violated the CMSA, which "prohibits the sale of cigarettes below cost when the seller intends thereby to harm competition or evade taxes." *Lorillard Tobacco Co. v Roth*, 99 N.Y. 2d 316, 319 (2003); *see* N.Y. Tax L. §§ 483-89. The cost below which cigarettes may not be sold includes "the invoice cost of cigarettes to the agent who purchases from the manufacturer, or the replacement cost of cigarettes to the agent . . . to which shall be added the full face value of any stamps which may be required by law." N.Y. Tax L. §483(a)(1). The Act presumes that cigarettes sold below this cost are sold with the requisite intent to harm competition or evade taxes. *See id.* § 484(a)(6). Thus, anyone who sells cigarettes to New York City residents at prices that do not include the cost of the tax stamps required by state and local law violates the CMSA.

In this case, the undisputed evidence shows that the Gordon Defendants have done so. Although the cost of the tax stamps required on cigarettes sold to New York City residents is over fifty dollars per carton, *see* N.Y. Tax L. § 471(1); Admin. Code §§ 11-1302(a)(1), (2), all of the cigarettes advertised on the Gordon Defendants' website are sold for under forty dollars per carton. (Proshansky Decl. ¶ 8, Ex. D). Further, on two occasions, the Gordon Defendants sold cigarettes to a City investigator for less than thirty dollars per carton. Finally, the All Of Our Butts website explicitly states that the company does not pay taxes on its products, a savings it then passes on to its customers "by offering discount cigarettes." (Proshansky Decl. Ex. D, at 3).

This evidence strongly supports the City's claim that the Gordon Defendants have violated the CMSA. Given the City's likelihood of success, it is entitled to a preliminary injunction barring the Gordon Defendants from continuing to violate the CMSA.

### C.  The CCTA

Finally, the City seeks a preliminary injunction against both Marcia Gordon (but not

Robert Gordon) and RPS under the CCTA.  The CCTA provides, in relevant part, that "[i]t shall

be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or

purchase contraband cigarettes or contraband smokeless tobacco."  18 U.S.C. § 2342(a).  As

relevant here, the Act defines "contraband cigarettes," in turn, as

> a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment
> of applicable State or local cigarette taxes in the State or locality where such
> cigarettes are found, if the State or local government requires a stamp, impression,
> or other indication to be placed on packages or other containers of cigarettes to
> evidence payment of cigarette taxes, and which are in the possession of any
> person other than —
>
> > (A) a . . . manufacturer of tobacco products . . . ;
> >
> > (B) a common or contract carrier transporting the cigarettes involved
> > under a proper bill of lading or freight bill . . . ; and
> >
> > (C) a person . . . who is licensed or otherwise authorized by the State
> > where the cigarettes are found to account for and pay cigarette taxes
> > imposed by such State . . . .

18 U.S.C. § 2341(2).

The Gordon Defendants concede that they have sold more than 10,000 unstamped

cigarettes to New York City residents.  (*See* Oral Arg. Tr. 26, 37; *see also* Bloom Decl. Ex. A, at

4-5 (admitting that in May 2012 they sold "more than 50 cartons [10,000 cigarettes] of

unstamped cigarettes to customers in New York City in a) one day; b) one week; [and] c) one

month")).  Similarly, RPS does not contest that it transported these cigarettes on behalf of All Of

Our Butts.  (*See* Oral Arg. Tr. 37; *see also* Bloom Decl. Ex. A, at 8-9 ("All Of Our Butts in May

2012 used RPS to ship all packages of cigarettes it sold to customers with New York City

addresses."); Bloom Decl. Ex. D, at 4 (RPS stating, in answering interrogatories, that it

transported one hundred packages in May 2012 from All Of Our Butts to New York City customers)).  Instead, Defendants argue that the City is not likely to prevail on its claims because (1) the CCTA exempts from civil suit "Indian[s] in Indian country," 18 U.S.C. § 2346(b), so Marcia Gordon, as the agent of Robert Gordon, an Indian in Indian country under the statute, may not be sued; (2) cigarettes are only "contraband" under the CCTA if they are found in "a quantity in excess of 10,000" in a single transaction; (3) RPS, as a common carrier, is exempt from liability under the CCTA; and (4) RPS did not know that the cigarettes it distributed were contraband, and therefore lacked the scienter required for liability under the CCTA.

### 1.  The "Indian in Indian Country" Bar

First, citing Title 18, United States Code, Section 2346(b), which provides that "[n]o civil action may be commenced" under the CCTA "against . . . an Indian in Indian country," the Gordon Defendants argue that the City's CCTA claims against Marcia Gordon fail because she is the agent of Robert Gordon, who is an Indian in Indian country. [2]  (Gordon Mem. 5-7).  "The CCTA claim against Marcia Gordon," they assert, "amounts to an indirect attack on Indian commerce that is barred by the statutory prohibition on claims affecting Indian sovereignty." (*Id.* at 5).  This argument is contrary to the Act's plain language.  The CCTA permits the City to "bring an action in the United States district courts to prevent and restrain violations of [the Act] by *any person*" except "an Indian tribe or an Indian in Indian country."  18 U.S.C. § 2346(b) (emphasis added).  As Marcia Gordon is not herself an Indian in Indian country, she may — under the plain text of the Act — be sued for its violation.  *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (stating that "the word 'any' has an expansive meaning" and that, where

---

[2]      Significantly, as the Gordon Defendants conceded at oral argument (Oral Arg. Tr. 28), the CCTA does not exempt Indians in Indian Country from its strictures altogether.  Instead, it merely prohibits parties from suing them civilly for its violation.

"Congress did not add any language limiting the breadth of that word," the Court could not limit it); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008) (noting the "interpretive principle that statutory exceptions are to be construed narrowly in order to preserve the primary operation of the general rule" (internal quotation marks and brackets omitted)).

### 2. The Definition of Contraband Cigarettes

Defendants' second argument — that cigarettes are only "contraband" under the CCTA if they are found in "a quantity in excess of 10,000" *in a single transaction* (Gordon Mem. 9) — is also contrary to the plain language of the Act. It is a fundamental tenet of statutory interpretation "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002). Thus, if a statute's text is unambiguous, its "language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The text of the CCTA is unambiguous: Put simply, it provides that "a quantity in excess of 10,000 cigarettes" constitutes contraband. 18 U.S.C. § 2341(2). It says nothing to suggest that the relevant quantity must be found in a single transaction.

By contrast, other provisions of the CCTA do contain an explicit per-transaction requirement. *See, e.g.*, 18 U.S.C. § 2342(b) ("It shall be unlawful for any person knowingly to make any false statement or representation with respect to the information required by this chapter to be kept in the records of any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 *in a single transaction*." (emphasis added)); *id.* § 2343(a) ("Any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 . . . *in a single transaction* shall maintain such information about the shipment, receipt, sale, and distribution of cigarettes as the Attorney General may prescribe by rule or regulation." (emphasis

added)); *cf. id.* § 2343(b) (establishing reporting requirements applicable to "[a]ny person . . . who engages in a delivery sale, and who ships, sells, or distributes any quantity in excess of 10,000 cigarettes . . . within a single month").  Defendants rely on these provisions to argue that a transactional limit should be read into Section 2341(2)'s definition of "contraband cigarettes," but the existence of these provisions cuts precisely the other way.  Indeed, it is well established that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Bates v. United States*, 522 U.S. 23, 30 (1997).  There is no reason to deviate from this principle here.

In support of their contrary interpretation, Defendants invoke two canons of statutory interpretation: the rule of lenity and the avoidance of absurd results.  (Gordon Reply Mem. 6 & n.7).  Neither canon, however, aids Defendants in this case.  First, the rule of lenity does not apply where, as here, a statute is unambiguous.  *See, e.g.*, *Callanan v. United States*, 364 U.S. 587, 596 (1961).  Second, giving effect to the plain meaning of Section 2341(2) does not result in absurdity, let alone the degree of absurdity required to disregard a statute's plain meaning.  *See, e.g.*, *Barnhart*, 534 U.S. at 462 (noting that while courts may disregard the unambiguous meaning of a statute to avoid absurdity, such a result is "rare"); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 368 (2d Cir. 2006) (describing as narrow the "category of cases in which the result reached by applying the plain language is sufficiently absurd to override its unambiguous terms").  Defendants invoke the specter of "an individual purchaser buying one carton of untaxed cigarettes per month for personal consumption over the course of five years" facing federal prosecution under the CCTA.  (Gordon Reply Mem. 6).  But while a policy argument could be

made that such conduct should not be criminalized or prosecuted, the proposition that someone

buying untaxed cigarettes in that quantity is *subject* to prosecution is not inherently absurd.

Finally, Defendants cite regulations promulgated by the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF") as well as a notice of proposed rulemaking that the ATF

published in the Federal Register.  (*See* Gordon Mem. 10 (citing 27 C.F.R. §§ 646.141, 646.143,

646.146); Gordon Reply Mem. 7 (citing 45 Fed. Reg. 2,855)).  Because the meaning of the

statute is clear, however, "that is the end of the matter"; there is no basis to consult an agency's

interpretation.  *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984).  In any event, the

ATF's pronouncements provide little support for Defendants' interpretation.  The published

regulations cited by Defendants relate to the CCTA's recordkeeping provisions, *see* 27 C.F.R. §§

646.141, 646.143, 646.146, which, as noted, do contain a "per transaction" requirement.  And

although the notice in the Federal Register states that the Act "makes it unlawful for most

persons to purchase, receive, possess, transport, ship, sell or distribute more than 60,000

cigarettes in a single quantity on which the State cigarette tax has not been paid," that statement

is in the context of rulemaking regarding those same recordkeeping provisions.  *See* 45 Fed. Reg.

2,855.[3]  Notably, elsewhere in the notice, and in the regulations themselves, the ATF provides

that a cigarette seller may not evade the CCTA simply by dividing a "single disposition of more

than 60,000 cigarettes into smaller components."  *Id.*; *see* 27 C.F.R. § 646.146.  Thus, even if the

ATF's interpretation were relevant, it does not call for a different result.

---

[3]      This notice was published in 1980, when the CCTA's definition of "contraband
cigarettes" applied only to a quantity in excess of 60,000 cigarettes.  *See* 18 U.S.C. § 2341(2)
(1980).  In 2006, Congress amended the Act to reduce the quantity of cigarettes required to
trigger liability to 10,000.  *See* USA Patriot Improvement & Reauthorization Act of 2005, Pub.
L. 109-177, § 121(a)(1), 120 Stat. 192, 221 (2006).

In short, the Court concludes that the definition of "contraband cigarettes" in Section 2341(2) applies to any quantity in excess of 10,000 cigarettes, without regard for whether that quantity is shipped, transported, received, possessed, sold, distributed, or purchased in one or more than one transaction.  In doing so, the Court joins the other courts in this Circuit that have considered the issue in any detail.  *See New York v. BB's Corner, Inc.*, No. 12 Civ. 1828 (KBF), 2012 WL 2402624, at *5(S.D.N.Y. June 25, 2012); *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08 Civ. 3966 (CBA), 2009 WL 2612345, at *35 (E.D.N.Y. Aug. 25, 2009).  In *Golden Feather*, for example, the defendants carefully structured their conduct to avoid selling more than 10,000 cigarettes in a single transaction.  They argued that because they had never made a single sale of more than 10,000 cigarettes, they had not violated the Act.  The Court disagreed, holding that "[n]othing in the CCTA provides that for cigarettes to be considered contraband they must be sold in a single transaction."  *See Golden Feather*, 2009 WL 2612345, at *35.  This Court agrees.[4]

### 3.  Common Carrier Liability

Next, RPS makes another argument in reliance on the language of Section 2341(2).  As noted above, that provision defines "contraband cigarettes" to be a quantity in excess of 10,000 unstamped cigarettes "which are in the possession of any person *other than*" certain specified persons, including a manufacturer, a person authorized to account for and pay state cigarette taxes, and, most relevant for present purposes, "a common or contract carrier transporting the

---

[4]     The only case that even arguably supports Defendants' position is *United States v. Morrison*, 596 F. Supp. 2d 661 (E.D.N.Y. 2009), in which the court stated that certain cigarette resellers did "not necessarily" violate the CCTA because their "resales may not have involved over 60,000 cigarettes per transaction."  *Id.* at 668 n.27.  It is not entirely clear whether this statement, made in a footnote and without any analysis of the issue, was meant to be an interpretation of the CCTA generally or as applied to the particular circumstances of that case. In any event, it is dictum and obviously not binding on this Court.

cigarettes involved under a proper bill of lading or freight bill." 18 U.S.C. § 2341(2) (emphasis added).  The obvious purpose of this provision is to allow for the possession of unstamped cigarettes by participants in the supply and distribution chain by which cigarettes move from their place of manufacture to stamping agents in a particular state.  *See* S. Rep. No. 95-962 (explaining that the provision allows "[t]he legitimate carrier [to move] a shipment of untaxed cigarettes . . . prior to the receipt by the intended state").  RPS goes one step further, contending that the provision creates a "safe harbor" for contract and common carriers to transport unstamped cigarettes as long as the cigarettes are shipped under a proper bill of lading.  (RPS Mem. 10).  This argument goes too far.

What RPS's argument overlooks is that Section 2341(2) defines cigarettes as non-contraband while they are "in the possession of" a common or contract carrier, but the CCTA makes it unlawful for "any person" — without limitation — not only to "possess" contraband cigarettes, but also to "ship, transport, receive, . . . sell, distribute, or purchase" them.  18 U.S.C. §§ 2341-42.  As applied here, that means that the unstamped cigarettes shipped by RPS from All Of Our Butts may well have been non-contraband when they were in RPS's possession, as RPS is indisputably a common carrier and it apparently had a proper bill of lading.  But neither All Of Our Butts nor the consumers to whom RPS delivered the cigarettes are persons permitted by Section 2341(2) to possess unstamped cigarettes.  Thus, the cigarettes at issue were plainly contraband when in the possession of All Of Our Butts and became contraband again when in the possession of the consumer.  It follows that RPS "receive[d]" contraband cigarettes from All Of Our Butts and "distribute[d]" contraband cigarettes to the consumers.  The fact that the cigarettes were non-contraband while in its possession does not immunize RPS from these prohibitions.

Although RPS argues that this interpretation of the CCTA is "impossibly restrictive" and "does not make any sense" (RPS Mem. 10), it is RPS's broader interpretation that lacks sense. Under the Court's interpretation of the Act, a common carrier that transports unstamped cigarettes from one entity that legally possesses them to another (or unknowingly transports unstamped cigarettes to or from an entity that is not entitled to possess them) does not violate the CCTA; it is only if the carrier receives cigarettes from, or distributes them to, an entity the carrier knows may not lawfully possess them that the carrier incurs liability.  In other words, the Act permits both the knowing transport of legal cigarettes and the unintentional transport of contraband cigarettes, and prohibits only the knowing transport of contraband cigarettes.  That result is not only sensible, but consistent with Congress's intent to crack down only on knowing participation in the illicit trade of cigarettes and to allow for legitimate distribution of cigarettes to stamping agents.  By contrast, RPS's interpretation of the Act would transform a limited exemption intended to create a safe channel for regulated distribution of cigarettes into a license to engage in contraband cigarette trafficking by common carriers.  *See, e.g.*, *Beretta*, 524 F.3d at 403 (noting that "statutory exceptions are to be construed narrowly in order to preserve the primary operation of the general rule" (internal quotation marks and brackets omitted)).

The Court's conclusion that Section 2341(2) does not grant blanket immunity to common carriers such as RPS is consistent with the conclusions reached by other courts to consider the issue.  *See City of New York v. Milhelm Attea & Bros., Inc.*, No. 06 Civ. 3620 (CBA), 2012 WL 3579568, at *23 (E.D.N.Y. Aug. 17, 2012); *City of New York v. Chavez*, No. 11 Civ. 2691 (BSJ), 2012 WL 1022283, at *3-4 (S.D.N.Y. Mar. 26, 2012).  In *Milhelm Attea*, for example, the City alleged that the defendants, cigarette wholesalers who were "licensed or otherwise authorized" by New York State "to account for and pay cigarette taxes," 18 U.S.C. § 2341(2)(C), had

violated the CCTA by selling unstamped cigarettes to Native American retailers whom they
knew were illegally reselling the cigarettes untaxed to non-Native American customers.  Relying
on Section 2341(2)(C), the cigarette wholesalers argued that, as licensed stamping agents, they
were immune from suit under the CCTA.  The Court disagreed, explaining as follows:

> Although it is true that, under the CCTA, a licensed stamping agent may possess
> unstamped cigarettes, the terms of 18 U.S.C. § 2341(2)(C) apply only to
> possession, not the other acts prohibited by the CCTA and relevant to this case,
> including shipment, transport, sale, or distribution.  18 U.S.C. § 2342(a).  This
> interpretation makes common sense.  A manufacturer or licensed stamping agent
> would of course possess unstamped cigarettes before completing its function:
> stamping the cigarettes, and distributing those properly stamped cigarettes to
> retailers.  The City has not claimed that the defendants violated the law when the
> unstamped cigarettes were merely sitting in their warehouses; the City's claims
> are predicated on the point at which the defendants ultimately distributed those
> cigarettes to retailers for resale to the public.

*Milhem Attea*, 2012 WL 3579568, at *23.  As the *Milhem Attea* Court concluded, "it would be
almost nonsensical for the CCTA to create a broad safe-harbor for state-licensed stamping agents
to distribute large quantities of untaxed cigarettes in violation of state law."  *Id.*  It would be no
less "nonsensical" to construe the Act as RPS would, "to create a broad safe-harbor" for common
and contract carriers to knowingly receive, ship, and distribute "large quantities of untaxed
cigarettes in violation of state law."  *Id.*

### 4.  RPS's Scienter

Finally, RPS argues that even if the common carrier exception is construed narrowly, the
City nevertheless cannot succeed on its CCTA claim because any participation by RPS in the
distribution of contraband cigarettes was not knowing.  In support of this contention, RPS notes
that "it does not pack the packages" it delivers "and is not aware of the exact contents . . . except
to the extent informed by All Of Our Butts."  (RPS Mem. 8).  Although the City has not offered
direct evidence of RPS's knowledge that the cigarettes at issue were contraband, there is

16

sufficient evidence to support the conclusion that, after discovery, the City is likely to show that RPS did know.  Among other things, there is no question that RPS knew that the boxes it delivered on behalf of All Of Our Butts contained tobacco products.  (*See* Proshansky Decl. Ex. F (letter from RPS explaining that the company "picks up boxes of tobacco products from smoke shops in and around the Salamanca, New York area"); Bloom Decl. Ex. C, at 4-5 (admission by RPS "that it is told by All Of Our Butts that the boxes include tobacco products")).  Additionally, the All Of Our Butts website states that the company does not pay taxes on its cigarettes.  (*See* Proshansky Decl. Ex. D).  Finally, a letter from RPS to the City stated that RPS had "signed Confidentiality Agreements with the smoke shops."  (*Id.* Ex. F).  Taken together, this evidence strongly suggests that RPS knew the tobacco products it shipped violated the law.

### D.  Defendants' Remaining Arguments Against Injunctive Relief

Defendants argue that, even if the City has demonstrated that it is likely to succeed on its claims, the Court nevertheless should not issue a preliminary injunction for three reasons.  First, they contend there is no need for a preliminary injunction because the Gordon Defendants have ceased selling cigarettes into New York City, and RPS has discontinued transporting cigarettes from All Of Our Butts to City residents.  (*See* Gordon Mem. 18; RPS Mem. 2).  Indeed, after the motion for preliminary injunction was fully briefed, the Gordon Defendants' former counsel submitted a declaration stating that All Of Our Butts is out of business.  *See supra* note 1.  A district court may not enter a preliminary injunction unless there is "a reasonable likelihood that the wrong [at issue] will be repeated."  *Golden Feather*, 597 F.3d at 121.  But "where a history of legal violations is before the district court, that court has significant discretion to conclude that future violations of the same kind are likely."  *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005).

And "[c]ourts are free to assume that past misconduct is highly suggestive of the likelihood of future violations." *Id.* (internal quotation marks omitted).

In this case, there is substantial evidence in the record demonstrating that Defendants have a long history of violating the statutes governing the sale and taxation of cigarettes. In addition, except for the declaration of the Gordon Defendants' former counsel, there is no evidence in the record that All Of Our Butts has in fact gone out of business, nor is there any evidence whatsoever that the Gordons could not sell cigarettes apart from All Of Our Butts. *Cf. City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08 Civ. 03966 (CBA), 2013 WL 1334220, at *31 (E.D.N.Y. Mar. 29, 2013) (granting an injunction despite the fact that the defendants had closed their stores). Furthermore, although RPS states that it has stopped shipping cigarettes from All Of Our Butts, it does not contend that it has stopped shipping contraband cigarettes from other distributors into New York City. The Supreme Court has cautioned district courts "to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit." *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952). Heeding this warning, the Court finds there is a reasonable likelihood that absent a preliminary injunction, Defendants will continue to violate the laws at issue here.

Second, the Gordon Defendants contend that this case raises "complex questions of law surrounding Native American sovereignty" that are poorly "suited to resolution through a preliminary injunction." (Gordon Mem. 18). In particular, the Gordon Defendants argue that the City is attempting to require them to stamp cigarettes manufactured by Native Americans and sold by a Native American to other Native Americans, in violation of Native American sovereignty. (Gordon Reply Mem. 5). The City is doing no such thing. Instead, it is merely

enforcing its tax on cigarettes sold to City residents.  The law is clear that, while states (and

cities) may not tax cigarettes sold to Native Americans on Native American reservations, they

may tax cigarettes sold by Native Americans to non-Native American consumers.  *See Dep't of

Taxation v. Milhelm Attea & Bros.*, 512 U.S. 61, 64-65 (1994); *United States v. Kaid*, 241 Fed.

App'x 747, 750 (2d Cir. 2007); *United States v. Morrison*, 706 F. Supp. 2d 304, 308 (E.D.N.Y.

2010).  Accordingly, this case raises no novel or complex issues regarding Native American

sovereignty.

     Finally, the Gordon Defendants assert that the City brought this case in retaliation for a

lawsuit Robert Gordon filed in the District of Columbia challenging the constitutionality of the

PACT Act, *Gordon v. Holder*, 826 F. Supp. 2d 279 (D.D.C. 2011).  (Gordon Mem. 21-23).

More specifically, Defendants contend that the City's arguments in this case are "diametrically

opposed" to the position it took in an amicus brief submitted to the D.C. Circuit, in which the

City stated that, in light of an injunction barring enforcement of provisions of the PACT Act not

at issue in this case, it had limited remedies against "delivery sellers" such as Robert Gordon.

(*Id.* at 22).  Although there is some tension between the statement in the City's amicus brief and

its position here that the Gordon Defendants have violated pre-PACT Act laws, including the

CMSA and CCTA, Defendants overstate the degree of conflict.  In any event, the fact that the

City may have engaged in some hyperbole in a brief filed in another case before a different court

does not provide a reason to deny it injunctive relief in this case.  Whatever the City said in its

brief to the D.C. Circuit, the law is what the law is and, for the reasons stated above, that law

entitles the City to a preliminary injunction given the facts of this case.

### E.  The Scope of the Injunction

The parties disagree about the proper scope of the injunction.  Defendants argue that any injunction should be limited to cigarette sales to New York City residents, whereas the City argues that the injunction should not be geographically limited.  (*See* RPS Mem. 14; Pl.'s Mem. Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n") 29; Oral Arg. Tr. 14, 22).  In general, "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past."  *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941); *accord SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 500 (S.D.N.Y. 2009).  Thus, a court may issue an injunction "forbidding acts in relation to unknown persons so long as, at the time the injunction issue[s], there [is] reason to fear that future violations would result from a pattern or plan of illegal activity already instituted."  *Motion Picture Studio Mechs., Local 52 v. NLRB*, 593 F.2d 197, 200 (2d Cir. 1979); *see also Guzman v. Bevona*, 90 F.3d 641, 650 (2d Cir. 1996) (upholding an injunction prohibiting a labor union, its president, and board members from "threatening legal action against" and "engaging or directing, or inciting others to engage in physical actions which . . . inhibit[ ] the free speech rights concerning union affairs of" not only the plaintiff union member, but also his supporters, who were not parties to the action); *Golden Feather Smoke Shop, Inc.*, 2013 WL 1334220, at *31 n.15 ("Where a history of misconduct exists, courts may craft broad injunctions . .  to prevent future violation." (brackets omitted)); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, No. 05 CIV. 2745 (LAK), 2006 WL 1293281, at *1 (S.D.N.Y. May 10, 2006) ("[E]quitable decrees may go beyond the specific misconduct in which a defendant engaged."), *aff'd*, 246 F. App'x 73 (2d Cir. 2007).

In this case, given Defendants' past conduct, it "may fairly be anticipated" that absent an injunction, they will continue to violate the laws at issue, not only with respect to customers in New York City, but with respect to non-Native American customers outside of New York City as well.  For example, Marcia Gordon, at her deposition, testified that All Of Our Butts sells cigarettes "to all 50 states."  (Proshansky Decl. Ex. B, at 18).  The All Of Our Butts website states that the store sells untaxed cigarettes to "customers nationwide."  (*Id.* Ex. D).  RPS's counsel sent a letter to the City stating that RPS ships packages from "various smoke shops" to customers "throughout New York State."  (*Id.* Ex. F).  And before this Court, RPS acknowledges that it shipped packages from All Of Our Butts "to various locations throughout the United States."  (RPS Mem. 1).  In light of this evidence, the injunction should not be geographically limited.  A broad injunction is also more consistent with Congress's assessment that trafficking in contraband cigarettes was an interstate problem that eluded enforcement by any one state given jurisdictional limitations.  *See, e.g.*, *United States v. Abdullah*, 162 F.3d 897, 901 (6th Cir. 1998) (noting that Congress recognized "'the interstate nature of the problem'" in enacting the CCTA and concluded that federal legislation was needed "to address the deficiencies engendered by the jurisdictional limitations of the individual states affected by the practices" (quoting S. Rep. No. 95-962, at 9)); *cf. Milhelm Attea*, 2012 WL 3579568, at *15 (stating, in reference to the CCTA's enforcement provisions, that "[t]he absence of any limiting language in this expansive grant of standing suggests that Congress intended to recognize a broad class of public injuries caused by the contraband cigarette market, and effectively to delegate enforcement authority to state and local governments").

## II.    The Defendants' Motions to Dismiss

In light of the foregoing, Defendants' motions to dismiss the City's claims under the PACT Act, the CMSA, and the CCTA are without merit.  Put simply, the City's claims under those statutes are not just plausible, but likely to succeed.  The Court turns, then, to Defendants' motion to dismiss the City's remaining claims, brought under RICO.  In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  To survive a Rule 12(b)(6) motion, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

To establish a RICO claim, a plaintiff must establish three elements.  *See, e.g.*, *De Falco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001).  First, the plaintiff must prove a violation of the RICO statute, which, in relevant part, makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c); *see De Falco*, 244 F.3d at 305.  Second, the plaintiff must establish "an injury to business or property."  *De Falco*, 244 F.3d at 305 (internal quotation marks omitted).  Finally, the plaintiff must show "that the injury

22

was caused by the violation of Section 1962." *Id.* (internal quotation marks omitted).  The Court

will address each element in turn.

### 1.  Violation of the Statute

The City has plausibly alleged a violation of the RICO statute.  In arguing otherwise,

Defendants initially contend that the City has failed to allege an enterprise within the meaning of

RICO.  The statute defines "enterprise" to "include[] any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."  18 U.S.C. § 1961(4).  Further, a plaintiff "must allege and prove the

existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the

same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533

U.S. 158, 161 (2001).  The City has done so.  First, the City identifies the RICO enterprise as

"All Of Our Butts."  (Am. Compl. ¶ 105).  Second, it alleges that Robert Gordon, Marcia

Gordon, several John Doe Defendants, *and* RPS "have been employed by or associated with"

that enterprise (Am. Compl. ¶ 106) — making clear that, contrary to Defendants' assertions, the

alleged RICO enterprise is distinct from "Robert Gordon d/b/a All Of Our Butts," who is

"identified in the Complaint as a RICO 'person.'"  (Gordon Mem. 12; *see also* RPS Mem. 20-

21).  To be sure, the City could have made this distinction more transparent by calling the

enterprise something other than "All Of Our Butts," but it is nevertheless clear from the

complaint that the alleged RICO enterprise and "Robert Gordon d/b/a All Of Our Butts" are

distinct from one another.

Furthermore, even if the complaint were read to allege that the "d/b/a" itself was the

relevant enterprise, such an allegation would still be sufficient.  A sole proprietorship may

constitute a RICO enterprise distinct from the individual defendant who owns it, so long as the

proprietorship is not "strictly a one-man show."  *City of New York v. Smokes-Spirits.com, Inc.*,
541 F.3d 425, 448 (2d Cir. 2008) (internal quotation marks omitted), *rev'd on other grounds by*
*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010).  In this case, the City has alleged that
All Of Our Butts employs several people.  (*See* Am. Compl. ¶¶ 9-10; *see also* Proshansky Decl.
Ex. A, at 7; Proshansky Decl. Ex. B., at 15, 17).  These allegations are sufficient to satisfy the
requirement of a RICO enterprise distinct from the person it comprises.

The City has also adequately alleged that Defendants engaged in a "pattern of
racketeering activity" through the "All Of Our Butts" enterprise.  (Am. Compl. ¶ 102).
Specifically, the complaint alleges that Defendants engaged in acts that were "indictable" under
the CCTA , which is a predicate offense under RICO.  18 U.S.C. § 1961(1)(B) ( defining
"racketeering activity" for purposes of the act as "any act which is indictable under" several
statutes, including "title 18, United States Code . . . sections 2341-2346 (relating to trafficking in
contraband cigarettes)"); *see Chavez*, 2012 WL 1022283, at *6 ("Racketeering activity is broadly
defined," and includes a variety of state and federal offenses, including violations of the CCTA."
(internal quotation marks omitted)).  Marcia Gordon and RPS argue that, for the same reasons
the City may not sue them for violation of the CCTA, they are not indictable under the Act.  As
explained above, however, these arguments are unavailing.

Robert Gordon, on the other hand, argues that the City cannot state a RICO claim against
him (1) because it has not asserted a CCTA claim against him and (2) because the City "has no
statutory authority to accuse him of violating the CCTA," as he is an "Indian in Indian Country."
(Gordon Mem. 12).  There is no requirement under RICO, however, that a plaintiff bring a
substantive claim for commission of the relevant predicate acts.  *See United States v. Fiander*,
547 F.3d 1036, 1042 (9th Cir. 2008) (permitting the United States to bring a RICO conspiracy

charge against defendant whom the Government did not and could not charge with underlying CCTA violation).  Indeed, in many cases RICO plaintiffs *cannot* bring a claim for commission of the underlying predicate acts: RICO allows for civil suits by private parties, but defines "racketeering activity" with respect to state and federal laws, most of which have only criminal penalties.  *See* 18 U.S.C. §§ 1961(1), 1964(c).  As for the second argument, the Gordon Defendants' counsel conceded at oral argument that Robert Gordon is "indictable" under the CCTA.  (*See* Oral Arg. Tr. 28).  That is for good reason, as his immunity from a *civil* suit under the Act does not render him immune from indictment and criminal prosecution under the Act. *Compare* 18 U.S.C. § 2344 (providing for criminal punishment of anyone who knowingly violates the CCTA, without limitation), *with id.* § 2346(b) (providing that "[n]o *civil* action may be commenced under this paragraph against . . . an Indian in Indian country" (emphasis added)); *see also Fiander*, 547 F.3d at 1042 (holding that a defendant who could not be prosecuted for violating the CCTA could nevertheless be prosecuted for a RICO conspiracy to violate that statute); *United States v. Baker*, 63 F.3d 1478, 1488 n.12 (9th Cir. 1995) (same).

Finally, the City has plausibly alleged a pattern of racketeering activity.  A "pattern of racketeering activity requires at least two acts of racketeering activity, . . .  the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961.  The City alleges that "[s]ince May 2002, the Gordon Defendants have sold, distributed, and caused to be delivered thousands of cartons of unstamped cigarettes to persons throughout the five boroughs of the City" (Am. Compl. ¶ 61), and that, "[s]ince June 29, 2010, the RPS Defendants have received, transported and distributed the unstamped cigarettes involved in the Sales to City Customers and caused them to be delivered to persons in the City" (*id.* ¶ 69).  The City also alleges that, on two occasions in 2012,

All Of Our Butts sold contraband cigarettes to a City investigator, cigarettes that were delivered by RPS.  (*Id.* ¶¶ 43-60).  These allegations satisfy the Act's requirements to demonstrate a pattern of racketeering activity.

Perplexingly, the Gordon Defendants argue that the City has failed to allege a pattern of racketeering activity because the "predicate activities" cited "occurred during a period of less than two years."  (Gordon Mem. 13).  To begin with, the City must allege *either* that the predicate acts occurred "over a substantial period of time," typically understood to encompass no less than two years, *or* that the enterprise poses "a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  As the City has alleged the latter, it need not allege the former.  In any event, the City does allege that the predicate acts extended over a period of more than two years.  The City alleges that the Gordon Defendants have been violating the CCTA since May 2002 (Am. Compl. ¶ 61), over ten years ago, and that RPS has been committing CCTA violations since June 2010 (*id.* ¶ 69), almost three years ago.  Accordingly, the City has satisfied the first prong of a RICO claim: It has sufficiently alleged that Defendants violated the RICO statute.

### 2.  Injury to Business or Property

The City's complaint easily satisfies the second element, which requires a plaintiff to allege "an injury to business or property."  *See De Falco*, 244 F.3d at 305 (internal quotation marks omitted).  Contrary to Defendants' contention (Gordon Mem. 14; RPS Mem. 22), the tax revenue the City alleges it has lost as a result of Defendants' CCTA violations constitutes such an injury.  *See Smokes-Spirits.com, Inc.*, 541 F.3d at 445 ("[L]ost taxes can constitute injury to 'business or property' for purposes of RICO."); *see also Pasquantino v. United States*, 544 U.S.

349, 355-56 (2005) ("Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada is 'property' in its hands.  This right is an entitlement to collect money from petitioners, the possession of which is 'something of value' to the Government of Canada. Valuable entitlements like these are 'property' as that term ordinarily is employed.").

### 3.  Causation

Finally, the City's complaint plausibly alleges that its lost tax revenue was proximately caused by Defendants' violation of Section 1962.  (Am. Compl. ¶ 156).  In arguing otherwise, Defendants rely on *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983 (2010). (Gordon Mem. 15; RPS Mem. 23).  *Hemi Group*, however, is easily distinguished from this case. There, New York City brought suit against an out-of-state cigarette dealer that sold cigarettes to City residents, alleging that the dealer's failure to file reports with New York State as required by federal law made it easier for City consumers to avoid paying taxes, resulting in lost revenue to the City.  The Supreme Court held that the causal connection between the Hemi Group's fraud — that is, its failure to file reports with the *State* — and the City's injury — that is, the *taxpayer's* failure to pay taxes — was too weak to support a RICO claim.  "Put simply," the Court explained, "Hemi's obligation was to file the . . . reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi."  *Hemi Group*, 130 S. Ct. at 990.  By contrast to the Hemi Group, the Gordon Defendants are *in-state* cigarette dealers and, thus, are required to charge, collect, and remit taxes directly to the City.  *See id.* at 987.  Given that, Defendants' alleged "selling, shipping, and transporting of the cigarettes was a direct cause of the tax evasion that injured the City."  *Chavez*, 2012 WL 1022283, at *7 n.6; *see also Milhelm Attea*, 2012 WL 3579568, at *17.

In short, the City has plausibly alleged a substantive RICO claim against all Defendants. It follows that the City has also properly alleged a RICO conspiracy claim.  Indeed, Defendants only argument to the contrary is that the City has not properly alleged an underlying violation of the CCTA or RICO itself.  As discussed above, the City has in fact done so.

**CONCLUSION**

For the reasons stated above, Defendants' motions to dismiss are DENIED and Plaintiff's motion for a preliminary injunction is GRANTED.  Plaintiff is directed to confer with Defendants and submit by **May 31, 2013** a proposed Order entering a preliminary injunction consistent with this Opinion and Order.

The Clerk of Court is directed to terminate Docket Nos. 28, 37, and 42.


SO ORDERED.

Dated: May 21, 2013
     New York, New York

                                         JESSE M. FURMAN
                                  United States District Judge